## THE GLENOGLE.

### (District Court, D. Washington, W. D. April 10, 1903.)

### No. 224.

**1. COLLISION—STEAMSHIPS CROSSING—NAVIGATION IN FOG.**

The Glenogle, a large ocean steamship, left her wharf at Tacoma, outward bound, at 4 in the morning—about dawn. Across the center of the bay was a low fog bank, which the Glenogle entered with her engines at full speed. At about that time she heard a signal of one blast a little on her port bow, from the steamship City of Kingston, which was coming in; and she answered with a like signal, and ported her helm. The vessels could not see each other, owing to the fog. The same signals were again exchanged, after which the Kingston gave a signal of two blasts, which was answered by the Glenogle with one. The Kingston's signal being repeated, the Glenogle gave an alarm signal, put her helm hard aport, and reversed to full speed astern, and at the same time the Kingston came into view; a collision resulting three minutes later, in which the Kingston was sunk and the Glenogle damaged. At the time of reversing, the Glenogle had attained a speed of from 7 to 9 knots. The bay is some 2½ miles across, and the ordinary courses of incoming and outgoing vessels crossed at about the place of collision, the outgoing vessels having the others on their starboard hand when approaching the crossing place. The Kingston, on entering the fog, stopped her engines, but about the same time changed her helm to starboard, departing from the straight course. The pilot of the Kingston mistook the direction of the Glenogle's signal, and at the second signal gave the cross-signal, and put on full speed, which was continued until collision, and also continued the course to port until immediately before the collision. *Held,* that both vessels were in fault, for failing to obey article 18, rule 3, of the rules for harbor navigation (Act June 7, 1897, c. 4, 30 Stat. 100 [U. S. Comp. St. 1901, p. 2882]), which required them to sound alarm signals on approaching another vessel whose position and course were not known; the Kingston, for the further reason that her pilot negligently acted on an erroneous supposition as to the position and course of the Glenogle, and persisted in going ahead at full speed under a starboard helm after his two blasts had been answered by a cross-signal; and the Glenogle, for her excessive speed in the fog, with another vessel ahead, which could not be seen.

**2. SAME—DAMAGES.**

Damages cannot be awarded to one of two vessels, both of which are held in fault for a collision, for disorganization of business on account of the delay consequent on the collision and the necessity for repairs, which are necessarily not capable of definite proof, where the owners of the other vessel may be presumed to have suffered like damages. Nor, when such vessel cuts short her voyage on account of the delay, can she be allowed for the cost of forwarding her cargo, when she has been allowed charter money during the time of the delay.

In Admiralty. Suit in rem by the owner of the passenger steamboat City of Kingston to recover damages for the destruction of that vessel by a collision with the steamship Glenogle in the harbor of Tacoma on the morning of April 23, 1899; and cross-libel by the owner of the Glenogle against the libelant to recover damages for the injuries to his ship and losses which he sustained by the collision.

¶ 1. Signals of meeting vessels, see note to Union S. S. Co. v. Erie & W. Transp. Co., 30 C. C. A. 630.

Findings and decree that both vessels were in fault, and that the entire damages be equally divided. The libelant, having sustained the heaviest loss, is awarded a decree for the excess above one-half the total loss.

B. S. Grosscup, for libelant.

Williams, Wood & Lynthicum, for underwriters of the City of Kingston.

James M. Ashton, for cross-libelant.

HANFORD, District Judge. To understand the movements of the two vessels, and the circumstances which produced the collision, it will be convenient to refer to the annexed map, showing the outline of Tacoma harbor, the lines along which vessels usually travel in entering and going out, and the points of the compass:

The stake light on Brown's Point is distant from the railroad wharf about two miles and a half. The entrance to the harbor is wide, the water deep, and there are no stationary obstructions, except mooring buoys placed by authority of the city government of Tacoma at convenient places offshore on the Tacoma side; and these are in use most of the time by vessels having occasion to tie up during times of detention. The collision happened at 4:16 a. m. on the morning of April 23, 1899, which was about the time of the dawn of day; and it was a calm, clear morning, with the exception of a low bank of fog in the middle of the harbor, extending easterly and westerly across the fairway. The high land on one side of the bay could be seen from the opposite side over the bank of fog, but two vessels in the fog were not visible to each other at a distance exceeding 300 feet. The usual course of large vessels outward bound from the railroad wharf is about northwest by north, magnetic, by the chart, until they get across the bay, within half a mile offshore, when they turn Brown's Point, and steer a more northerly course; and steamers coming in from the north habitually run up to within a quarter of a mile from the shore, a mile or more northward from Brown's Point, and then keep close to the shore until opposite the stake light on Brown's Point, and from there they steer a course south southeast, by the chart, until they reach the vicinity of the buoys, when they take a course directly in to their berths. This usual practice of entering the harbor on a course crossing the track of outward bound vessels has been long continued, and is well known to all local pilots.

The Glenogle is a large iron steamship, 435 feet in length, 25.35 feet depth of hold, and 45.15 breadth of beam. Her hailing port is Glasgow, and at the time she was one of the Northern Pacific Line, carrying freight and passengers between Tacoma and ports of Japan and China. She was loaded with 4,000 tons of cargo, and 1,056 tons of coal for her own fuel. At 4 o'clock a. m. she started from her berth at the Railroad Wharf, and maneuvered for 10 minutes to get clear of the dock and pass a ship moored to one of the buoys. At 4:10 her engines were started full speed ahead, and she was then on her course about northwest by north, magnetic, by the chart. When she had developed a rate of from seven to nine knots per hour, her engines were suddenly reversed in an effort to avoid the collision. She was approaching the bank of fog in the middle of the harbor when the presence of the City of Kingston was first made known by a single blast of a steam whistle, which was at once recognized as the Kingston's whistle, and which was promptly responded to by a single blast of her siren, and a few seconds later the same signals were repeated by both vessels. The Kingston was located by her whistles off the port bow of the Glenogle. At the time of responding to the first signal from the Kingston, the Glenogle ported her helm, and a few seconds after the second exchange of signals the Kingston gave two blasts of her whistle, to which the Glenogle responded with one blast, and set her helm hard aport, and the Kingston immediately repeated her signal for a starboard passing by two blasts of her whistle. The Glenogle then turned her engines full speed astern, and sounded an alarm by four blasts; and at the same time the Kingston came into

view, showing her green light. The two vessels were so near together at that time that the collision could not be avoided, and the bow of the Glenogle cut into the starboard side of the Kingston a little forward of her center.

The City of Kingston passed the stake light on Brown's Point at 3:57 a. m. She was then 500 or 600 feet offshore, and going at her usual rate of about 12½ miles per hour, which was maintained until she came to the bank of fog in the middle of the harbor. After passing Brown's Point, she steered her usual course across the bay, heading south southeast by her compass. When she came to the edge of the fog bank she gave one blast of her whistle, and stopped her engines, but continued ahead by force of her momentum. The Glenogle's response to her first signal was distinctly heard by the Kingston's pilot, and, being a siren, was recognized as the signal of a large ocean steamship. The pilot, however, committed an error in locating the other vessel. To him the siren seemed to be one or two points off the starboard bow of his vessel, and he assumed that it came from a vessel to the westward of his position, and on a course which would take her more to the west, whereas the Glenogle was then to the eastward of a line straight with the Kingston's keel, if she was still on her course, headed south southeast. The pilot was standing on the starboard side of the pilot house, and he may have made a simple mistake in locating the sound. There is no other way to account for his error, except by assuming as a fact that he had already turned his vessel three or four points to the eastward, as he would do, to take her into her berth after crossing the bay. I believe that the Kingston was swinging on a starboard helm when she gave the first single blast of her whistle, which was intended as a fog signal, and that her pilot has attempted to suppress an important fact, by not telling when he first changed his helm to starboard. This theory comports with the pilot's statement made to the officers of the Glenogle immediately after the collision. The second response from the Glenogle indicated to him that the Kingston was in danger, and it was his idea to give more room, by going ahead and swinging to port. He accordingly started ahead full speed, with his helm to starboard, and at the same time gave the signal indicating that the Kingston was swinging to port. When the Glenogle responded by a single blast, instead of sounding an alarm he repeated the signal for a starboard passing by two blasts, and signaled to the engine room to work the engines ahead to their utmost capacity. Just as the Glenogle gave her four blasts, she became visible through the fog, showing both her green and red lights to the starboard side of the Kingston. The pilot then faltered in the execution of his plan, and changed his helm to port, but gave no order to reverse her engines. The two vessels collided as already described, and the hull of the Kingston sank 20 minutes afterward. Her upper works did not go down with the hull, but remained afloat, and no lives were sacrificed.

The Kingston was a modern passenger iron steamboat, 246 feet in length, and was employed on a regular route, making daily round trips between Tacoma and Victoria, via Seattle and Pt. Townsend. At the time of her destruction she was worth $140,000, and, except a small

amount of wreckage, from which about $2,000 was realized, she became a total loss. The Glenogle was damaged, by the breaking of her frames and injuries to the plates on her port side, and by reason of detention for repairs, and necessary incidental expenses, to the amount of $25,870.

In behalf of the libelant an effort has been made in the introduction of evidence and the arguments to throw the entire blame for the collision upon the Glenogle, on the ground that she ran into the fog at an excessive rate of speed, and ported her helm when her position was to the westward of the City of Kingston, bearing one or two points from the Kingston's starboard bow; thereby changing from a course which would have given plenty of room for the two vessels to pass starboard to starboard, to a course crossing the Kingston's path. I fully assent to the proposition that the Glenogle, in the few minutes that she was under way, with her engines working ahead full speed, had developed a high rate of speed, which was not checked promptly, as it should have been, when her officers were apprised that the Kingston was ahead in the fog, which was a serious fault on her part, and a contributing cause of the collision. I am constrained, however, to reject the contention that an error was committed in porting her helm and swinging to starboard as she did. In the first place, she was not to the westward of the Kingston, but the two vessels were on crossing courses when they exchanged signals the first time, and they should have passed each other port to port; and, in the second place, the collision would not have been avoided if the Glenogle had held her course, for the reason that the Kingston changed her course, swinging to port before the two vessels became visible to each other, and committed the error of attempting to cross ahead of the Glenogle.

On the other hand, the cross-libelant contends that the Glenogle should be exonerated, and the entire blame for the collision placed upon the City of Kingston, on the ground that the pilot of the latter vessel was mistaken as to his position when the two vessels commenced signaling to each other, and that the Kingston was in fault for going ahead full speed on a starboard helm when her officers could not see the Glenogle, and did not know the course she was steering. I fully assent to the proposition that the City of Kingston was in fault as above specified in both particulars, and that these errors on her part were contributing causes of the collision. But this does not entitle the Glenogle to exemption from responsibility. Under the conditions described, it was the duty of the Glenogle to check her speed, and wait until she was sure of being able to pass in safety. The collision might have been avoided easily if, when the second signals were exchanged, indicating to both that they were approaching into dangerous proximity, they had both observed rule 3, contained in the eighteenth article of the rules for harbors, rivers, and inland waters prescribed by the act of Congress of June 7, 1897, c. 4, 30 Stat. 100, U. S. Comp. St. 1901, p. 2882, and then proceeded cautiously. The rule reads as follows:

"If, when steam-vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel

so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam-whistle."

My conclusion that the pilot of the City of Kingston did not know her position when he signaled by two blasts from her whistle for a starboard passing, and ordered her engines to work ahead full speed, is based upon uncontradicted testimony proving that his first declaration made to the officers of the Glenogle on her bridge immediately after the collision was to the effect that he supposed the Kingston had crossed the bay and was in the vicinity of the buoys, and that the Glenogle was responding to his signals while she was yet moored to the dock. Considering the fact that he was in clear atmosphere when off Brown's Point, and for a distance of about 1 mile therefrom, and that it is only 2½ miles across the bay, this error on his part was inexcusable. I consider, also, that his management of the Kingston, in going ahead full speed on a starboard helm, and persisting in that course after his two blasts had been answered by a single blast from the Glenogle, and then in porting the Kingston's helm, and not stopping and reversing her engines when he saw that a collision was inevitable, is so obviously faulty that further comment is unnecessary.

I deem it proper to make a further explanation of the facts upon which I base the conclusion that the Glenogle was in fault for running into the fog bank at an excessive rate of speed. I am obliged to reject the statements of the captain and pilot with respect to the speed of the Glenogle, because by arithmetical calculations it appears to me that their statements with respect to the rate of speed are inconsistent with other material facts which they have sworn to. By their testimony and the ship's log it is proved that the Glenogle's lines were let go, and she commenced to maneuver to get away from the dock, at 4 o'clock a. m., at which time the tide was commencing to ebb. Her engines were working slow or stopped during the first five minutes, and at 4:05 they were turned ahead at half speed, and continued working ahead half speed for the next five minutes. At 4:10 the ship was headed on her course, northwest by north, magnetic, and her engines were accelerated to full speed ahead, and continued working ahead full speed until 4:13. At 4:12 she ported her helm, and at 4:12½ her helm was set hard aport. At 4:13 the Kingston became visible, showing her green light on the port side of the Glenogle, and the Glenogle's engines were instantly reversed, and commenced working astern full speed, and to their utmost capacity, and her helm was held hard aport. At 4:16 the impact of the collision occurred, the Glenogle being then stopped—that is, stationary in the water, with her engines working full speed astern—the Kingston striking her broadside against the Glenogle's bow on her port side. The place of the collision was distant from the dock from which the Glenogle started one mile and a quarter, as estimated by the Glenogle's officers. As soon as possible after the collision, and while the Glenogle was in the same place, her captain and pilot took cross-bearings from objects ashore, and, based upon their testimony giving the cross-bearings, Commander Noel, U. S. N. (retired), subsequently, as shown by his testimony in the case, located the place of the collision, and calculated the distance at 6,374 feet in a straight line from a light on the dock

to eastward of the Glenogle's berth. In his testimony, the captain of the Glenogle estimates the speed of his ship preceding the collision as follows: At 4:05 a. m., 1 knot and a half per hour; at 4:10, not exceeding 2 knots and a half; and that her maximum rate at 4:13, when her engines were reversed, was from 3½ to 4 knots per hour. On his cross-examination the captain emphasized his testimony, to the effect that he was absolutely sure that 4 o'clock was the time of starting, that 4:16 was the time of the collision, that from the time of turning the engines ahead slow to the time of the collision was 11 minutes, and that during 5 of the 11 minutes the speed of the ship through the water did not exceed 1 knot and a half per hour. The captain's estimate of speed is supported by the testimony of the pilot, except that the pilot gives the maximum rate acquired at the time of reversing the engines as not exceeding 4½ knots per hour, and he corroborates the testimony of the captain to the effect that the engines were reversed 3 minutes before the collision occurred, and that the ship had then come to a full stop, and he gives in minute detail all movements of the ship from the time that her lines forward were cast off and she commenced to swing with the tide. Now, assuming that with the assistance of the ebb tide, and her engines working slow for 5 minutes, she gained a distance of 2,000 feet from the light on the dock, which is a liberal estimate in her favor, we may take as a starting point for our calculations her position at that distance from the light, and the time as 4:05. Then, with her engines working ahead half speed, developing a rate not exceeding 1½ knots per hour, she would have traveled during the next 5 minutes a distance not exceeding 760 feet. Then, with her engines working ahead full speed for the next 3 minutes, if she developed a rate of not over 4½ knots, and if her average speed for the 3 minutes did not exceed 3½ knots per hour, she would have traveled a distance not exceeding 1,065 feet. Then, from 4:13 to 4:16, with her engines working astern at their full capacity, and swinging on her port helm, a quick ship, as the Glenogle is, should have come to a full stop without sagging ahead a greater distance than about her own length—435 feet. The total of these distances is 4,260 feet, or 12 feet more than two-thirds of the distance from the light to the place where the collision occurred, measured in a straight line; and, if allowance be made for curves in the track which she actually traveled, the discrepancy will be increased. The Glenogle's propeller is 19 feet in diameter; this, with superior engines, which presumably she has, gives her great power; and the testimony of Lieut. Ferguson, U. S. N., who timed her, proves that she is a quick ship—that is to say, she gathers headway very quickly. His testimony is to the effect that subsequently to the collision, when the conditions of tide and weather were the same, and the Glenogle was going out of Tacoma Harbor, loaded so that her draught was the same as at the time of the collision, he was on board, and made careful observations, and timed her, using for the purpose a stop watch; that she started from the same dock at 4 o'clock a. m., and consumed 14 minutes in maneuvering to get upon her course; that at 4:13 her engines were ordered ahead at full speed, and at 4:19 she was going through the water at a rate of 9 knots per hour. This testimony

proves the actual capacity of the Glenogle to develop a speed of 9 knots per hour in 6 minutes, and, in connection with the established facts as to the distance traveled, the sinuosities of her maneuvers in getting away from her berth and avoiding obstructions, and the time she was under way before the collision, removes all doubt as to the dangerously high rate of speed developed while she was going towards the fog bank and towards the City of Kingston. I give to the Glenogle the benefit of a liberal estimate of distance, in placing her 2,000 feet from the dock light at 4:05. With that distance behind her then, and allowing 774 feet as the distance which she moved forward in the last 3 minutes preceding the collision, she must have traveled 3,600 feet in the 8 minutes between 4:05 and 4:13 (making an average rate of $4^7/_{16}$ knots per hour during that 8 minutes), in order to have arrived at the place of the collision at 4:16. Her speed was not uniform for any part of the time. She was going slow at 4:05, and speed was increasing constantly from the time when her engines were turned ahead at full speed until they were reversed. Therefore I conclude that she was going at a rate of from 7 to 9 knots per hour at 4:13, which was certainly reckless navigation, considering that she was in the fairway of a harbor, and going into a bank of fog, with another steamer ahead of her, which could not be seen.

On the question of damages, I find the value of the City of Kingston to have been $140,000, to which should be added loss of freight, and claims which the libelant has paid for lost baggage and express packages, amounting in the aggregate to $5,400, after cutting off a few small items which were not sufficiently explained in the testimony to justify allowance. I consider $1,500 a fair estimate of the net value of the wreckage saved, which, being deducted, leaves the total amount of libelant's loss on account of the collision $143,900. The losses sustained by the cross-libelant, including his ship's charter money during the time of her detention, cost of repairs, survey, unloading and storing her cargo, reloading, additional provisions, extra insurance premiums, and additional pilotage, amount to the total sum of $25,870, which will be allowed. Other items of damage were claimed by the cross-libelant, including a lump sum of $3,500 for commission of agents, lawyer's fees, and expenses incidental to this lawsuit; expenses of forwarding freight from the terminus of her voyage in Japan to other oriental ports, $5,000; loss of freight expected to have been earned if the voyage had not been cut short $15,000; a lump sum of $6,000 for sundry disbursements in oriental ports, not itemized or explained; and $20,000 for disorganization of business. Some of the items in this list are purely speculative. For instance, it cannot be taken as a fact that the Glenogle would have earned money by carrying freight between ports in Japan and China, for the reason that there is no proof, and in the nature of things there could be no proof, that the Glenogle would not have been delayed and sustained loss from other causes if she had continued her voyage according to expectations, instead of turning back on her return voyage after arriving at Yokohama, and consequently there is no basis for estimating what might have been earned by carrying freight between the ports mentioned. It may be assumed that the collision and incidental delay

caused the cross-libelant inconvenience to such an extent as may be fairly characterized as "disorganization of business." But his losses from such cause will not be presumed to have been greater than the loss sustained by the libelant from disorganization of business incidental to the total destruction of its steamboat, and if evidence may be dispensed with, and a mere presumption be made the basis for awarding damages to one party, I hold that it would be right to carry the presumption further, and set off against such claim similar losses to the other party which may be also presumed from the nature of the casualty. Lawyer's fees and expenses of litigation are not recoverable as damages, except in the taxation of costs by the prevailing party. It is my opinion, also, that the item of $5,000 for expenses of forwarding freight from Yokohama to Hong Kong cannot be fairly classed as a loss incidental to the collision, for the reason that the Glenogle was not prevented from completing her voyage as originally contemplated, but was merely delayed; and I have allowed compensation for delay, to the extent of her charter money for the time of actual detention.

The aggregate amount of the losses sustained by the owners of both vessels, as proved and allowed by the court, is $169,770, which, being divided equally, makes the loss to be sustained by each party $84,885; and the difference between the latter amount and the damages sustained by the libelant is $59,015, which by the decree to be entered herein will be awarded to the libelant, with interest thereon at the rate of 6 per cent. per annum from the date of filing the libel, which was April 23, 1899, and one-half the usual taxable costs.