CLARKE S. S. CO., Limited, v. MUNSON S. S. LINE.

No. 12408.

District Court, E. D. New York.

May 18, 1932.

As Corrected May 31, 1932.

Hunt, Hill & Betts, of New York City (John W. Crandall and Geo. Whitefield Betts, Jr., both of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Roger B. Siddall, of New York City, of counsel), for respondent.

CAMPBELL, District Judge.

This is an action brought to recover amounts alleged to be due for charter hire for the steamship New Northland, disbursements for extra crew's wages, and balance of inventory missing.

The respondent pleads an offset for the amounts alleged to be due for the purchase of supplies, for excess of fresh water on board at the time of redelivery over that on board at the time of delivery, for time off charter, and for fuel consumed during that time, and for various losses of respondent, including the loss of passage moneys, freights, good will, etc., due to the failure of the libelant to take the necessary steps to place the vessel in a fit condition as to external appearance.

I find the facts as follows:

At all the times hereinafter mentioned and at the time of the trial, the libelant was a corporation, organized and existing under and by virtue of the laws of the Dominion of Canada, and the owner of the British steamship New Northland, about 300 feet long and about six years old, of 3,445 tons gross and 2,028.79 tons net registry, registered at the port of Quebec.

At all the times hereinafter mentioned and at the time of the trial, the respondent, Munson Steamship Line, was a corporation, organized and existing under and by virtue of the laws of the state of New York, with an office and place of business at No. 67 Wall Street, in the borough of Manhattan, city of New York.

On or about the 24th day of November, 1930, a charter party in writing was entered into between the libelant as owner, and respondent as charterer, whereby libelant agreed to let and respondent agreed to hire the said steamship New Northland, for a period of not less than 110 consecutive days, between December 26, 1930, and April 15, 1931, with an allowance of 15 days grace in case of delivery and redelivery under certain conditions over which neither party should have control; the amount of charter hire to be computed for the period between the dates when the ship was accepted, respectively, by charterer on delivery and owners on redelivery, steamer to be employed in lawful trades between certain ports including the ports of Miami and Nassau; the owners to provide and pay the wages of captain, officers, engineers, and crew, as well as insurance on the vessel; charterer to provide, among other things, all fuel, water, port charges, loading, stowing, unloading, and weighing cargo, surveys on hatches, meals to officials, and all other charges and expenses of every kind, nature, and description.

The owners agreed and undertook that the vessel would be "in every way fitted for first class passenger and cargo service," and also agreed and undertook "to maintain steamer in a thoroughly efficient state in hull and machinery and passenger equipment during this service." Also:

"(4) Charterers at port of delivery, and Owners at port of re-delivery to take over and pay for all reasonable quantities of coal or oil fuel, provisions, oils and greases, remaining in steamer, payment to be made at prices current in the port of New York."

"(5) Charterers shall pay as hire Four hundred and thirty six dollars and thirty six cents ($436.36) per day in United States currency. Payment of hire shall be made in cash, to the Agent of the Bank of Montreal, Wall Street, New York City, New York, every fifteen days in advance."

"(16) Steamer to work day and night if required. Charterers to refund owners their outlays for all overtime paid to officers and crew according to the laws of the steamer's flag."

"(30) Steamer to be delivered to charterers with following equipment as on board for Charterers' use for service on board; bed and table linen, blankets, kitchen and other utensils, silverware, crockery, glassware, furniture and rugs and curtains for staterooms and public rooms; a complete inventory of this equipment to be given to Charterers on delivery of steamer and to be checked and accepted in writing by Charterers and on re-delivery, Charterers to furnish complete list of equipment to Owners, and re-deliver same clean and in like good order as received and any equipment found missing, broken or damaged, will be paid for by Charterers (at the cost thereof to Owners), fair wear and tear excepted."

Pursuant to the terms of said charter party, said steamship New Northland was delivered by the libelant to the respondent at New York, and accepted by the respond-

ent on the 26th day of December, 1930, and entered into the performance of said charter party, and was taken by said respondent to Miami, Fla., and employed by it in its trade between Miami and Nassau during the winter months.

The charter in question was the fourth one which the parties had entered into covering the New Northland; she having been under charter to the respondent for the three preceding winter seasons.

The steamship New Northland was drydocked in Montreal in November, 1930, and given a general overhauling and a new bronze propeller was installed. At that time she was put through her annual Canadian government inspection, and her new No. 1 Lloyds classification survey was completed.

The steamship New Northland was at Montreal at the time the charter was made.

During the summer months, the steamship New Northland ran between Montreal, Quebec, the Gaspe Coast, and Newfoundland.

The steamship New Northland sailed from Montreal for New York on November 27, 1930, going by way of Corner Brook to Middle Arm and North Arm Bay of Islands, where a cargo of fish in barrels was picked up, and Halifax for fuel, arriving at New York about 10:35 o'clock a. m. December 22, 1930, and went to Pier 37, Atlantic Basin, Brooklyn, where the cargo was discharged.

The steamship New Northland had been washed and painted all summer, but, due to the very cold weather, rain, and snow, painting and washing generally had not been done subsequent to October 1, 1930, as it could not be done successfully in very cold weather or when it rains or snows.

The weather from Halifax to New York was very cold with rain and snow, and washing and painting generally could not be done.

As a result of these conditions, the steamship New Northland presented a somewhat dirty appearance on her arrival in New York, but a somewhat better appearance than she had on her arrival in New York the year before, to enter on the preceding charters.

The weather while in New York was of such a character that washing and painting generally could not be done, but the Munson colors were painted on the smokestack. This painting was rendered possible by reason of the weather clearing for a time and the fact that the stack was somewhat warm, but the rain was pouring down before it was finished.

The painting of the stack was later done over after the vessel arrived in the South.

Such washing and painting as was possible was done by the crew of the steamship New Northland on December 22d and 23d, but they were unable to do any work on the 24th day of December, 1930, because of the condition of the weather in the morning, and because in the afternoon the New Northland was shifted to Bayonne to take on the oil needed for the passage south. After taking on the oil, the New Northland was shifted to Pier 9, East River, the Munson Line Pier.

This shifting was done for the benefit of the respondent, which desired the New Northland to start south on the 26th day of December, 1930, when the charter commenced. No work could be done on Christmas.

It was agreed between representatives of the libelant and respondent, who were desirous of having the vessel start for the South, that the painting should be done at Nassau, and the libelant gave orders to the master to employ extra men at Nassau to assist in the painting.

On December 26, 1930, the New Northland sailed for Nassau, where she arrived on December 30, 1930.

During the voyage south some cleaning was done on the vessel, but no painting could be done on account of the weather, which was so bad that you could not get an observation of the sun in all the time from leaving New York until arrival at Nassau.

The New Northland arrived at Nassau at about 2 o'clock a. m., and on orders by wire from the respondent's representative anchored outside the harbor and was met by a pilot.

At daylight the New Northland went into the harbor and docked, and the men who were secured by the respondent's stevedore were hired and with the crew immediately started to clean and paint.

The New Northland left Nassau for Miami at about 3 o'clock p. m., on December 31, 1930.

The crew continued painting both at Miami and Nassau, but additional men were employed by the libelant only when the New Northland was at Nassau, and by the 10th of January, 1931, the work of cleaning and painting had been substantially accomplished.

Due to the fact that there was more rain and dampness than in the previous year, and

that the smoke from the respondent's canal steamer or tug Montgomery at Miami discolored fresh paint, the amount of painting required was greater and the libelant employed extra men at Nassau to assist the crew in cleaning and painting until well into the month of February.

Cleaning and painting is a continuous job on a passenger vessel like the New Northland, and the principal work of the crew when the vessel is not shifting.

No protest of any kind was made by the respondent, its agents or servants, about the condition of the paint of the New Northland. The condition of the vessel's paint when in New York was exactly what was to be expected in a boat which had been north and could not be remedied there, but her condition was somewhat better than in the preceding year, and her cleaning and painting after arriving in the South was by agreement with respondent's representative.

There is no contention on the part of the respondent as to the seaworthiness of the vessel or her internal condition in any respect.

No suggestion, even, was made by respondent, its agents or servants, that any loss was being suffered by it by reason of the external condition of the vessel until the time arrived for final settlement.

The vessel was highly commended by the president of the respondent when he inspected her on February 22, 1931, and the officers were commended by representatives of the respondent. A letter of commendation was also sent by a passenger.

A comparison made of the passengers carried in 1929–30, and in 1930–31, on the steamship New Northland, showed that she carried fewer passengers in 1930–31; likewise of the passengers carried by the Airways shows that they carried more passengers in 1930–31 than in 1929–30.

The Airways used larger planes in the year 1930–31, capable of carrying a greater number of passengers. A larger number of cruise ships, stopped at Nassau in the latter than in the former year, both going to and coming from New York. Those who went to Nassau in the latter year stayed for shorter times than in previous years. The general business conditions of the country in 1930–31 were not as good as in 1929–30.

There was no evidence of any loss of passage moneys, freights, good will, etc., by reason of the external appearance of the steamship New Northland with reference to her paint, nor of damage of any kind suffered by the respondent by reason thereof.

| | |
|---|---:|
| On March 26, 1931, a balance of the charter hire for the New Northland fell due to libelant from the respondent, pursuant to said charter party on that date, amounting to ...................................... which, when demanded, respondent, its agents or servants, failed to pay. | $3,045.40 |
| On April 15, 1931, the balance of the charter hire for the steamship New Northland to the end of the charter party fell due to libelant from the respondent, pursuant to said charter party, amounting to | 2,181.80 |
| The following sums likewise fell due to the libelant from the respondent at the end of the charter party, pursuant to the terms thereof: | |
| Balance of extra crew's wages or overtime paid by libelant on respondent's account | 708.41 |
| Balance of inventory missing on redelivery of the New Northland...................... | 797.73 |
| | $6,733.34 |

| | |
|---|---:|
| At the request of the libelant, respondent expended for libelant's account in the purchase of supplies, etc. ........................... | $573.81 |
| Respondent is entitled to an agreed credit against the libelant of...... for the amount by which the fresh water on board on redelivery exceeded the amount of fresh water on board on delivery. | 146.70 |
| Respondent is entitled to a credit against libelant of $119.80 on account of hire and fuel consumed during a period of 5½ hours on April 2, 1931, when the sailing of the vessel was delayed pending the posting of a bond by libelant in an action brought by a former member of the crew for an injury claimed to have been sustained by him prior to the period of this charter ............................. | 119.80 |
| | $840.31 |
| Balance due libelant..................... | $5,893.03 |

From the facts as found, the liability of the respondent for the balance aforesaid is clearly established.

The cleaning and painting of the vessel on arrival at the South was in accordance with what had been done on the two preceding charters.

The cleaning and painting of the vessel before it arrived, and during the time it was in New York, was impossible, and this was known to respondent when it chartered the vessel, which was then at Montreal.

Much testimony was offered on behalf of respondent as to conversations between its representatives and the master of the vessel and representatives of the libelant, but I cannot find that there was any real protest made, or even the suggestion of any breach of the charter party by libelant because of the failure to clean and paint the ship made by the respondent, its agents, servants, or employees, until the time arrived for a final settlement.

The anxiety of the respondent to secure the vessel at the earliest possible moment is shown by the fact that it secured the privilege of placing fuel oil aboard the vessel on December 24, 1930, two days before she went on charter and started the vessel south on December 26, 1930, the very day she went on charter.

If there was any breach of the charter party as to painting, which I believe there was not, then by the agreement made by the representatives of the respondent and libelant to have the painting and cleaning done after the arrival at Nassau, and that libelant was to employ men in addition to the crew for the work, the respondent waived that breach.

The charterer may waive the terms of a charter or a breach thereof. Glasgow Shipowners Co. v. Bacon (D. C.) 132 F. 881, affirmed (C. C. A.) 139 F. 541; Cornhill S. S. Co., Limited, v. West India S. S. Co. (C. C. A.) 194 F. 396; The Oregon (C. C. A.) 55 F. 666; Sanford & Brooks Co. v. Columbia Dredging Co. (C. C. A.) 177 F. 878; Frank Waterhouse v. Rock Island Alaska Min. Co. (C. C. A.) 97 F. 466; Wencke v. Vaughan (C. C. A.) 60 F. 448.

There is no evidence in this case on which to base any finding of damage, even if it should be found that the failure to clean and paint said vessel before she went on charter constituted a breach of the charter party, which in my opinion it did not, or that, if there was a breach, that it was not waived. The Glenogle (D. C.) 122 F. 503, 510.

The last-cited case is the nearest in point in admiralty, but, judged by the rule applied in libel and slander cases, where the libel was alleged to have caused loss of business and was found not to be libelous per se, and the plaintiff was required to prove special damage, the evidence on behalf of the respondent in this case is clearly insufficient to establish the damages which respondent seeks to offset. Erick Bowman Remedy Co. v. Jensen Salsbery Laboratories (C. C. A.) 17 F.(2d) 255, 261, 262, 52 A. L. R. 1187.

The fact that a smaller number of passengers were carried, either east or west bound, proves only that Mr. Munson, when the charter party was negotiated, correctly foresaw the effect of the depression and competition which he expected from the Pan American Airways. In addition to which, and not foreseen by him, was the increased number of cruise vessels calling at Nassau, bound in either direction.

The fact that Mr. Munson expected a falling off in business is shown by the fact that, in negotiating the charter party, an agreement was reached whereby the crew of the New Northland was reduced, and the charter hire was reduced $9,200 below that of the last season.

No passenger gave evidence for respondent, and no one who refused passage was called, nor was any witness called in support of respondent's contention, except its agents, servants, and employees.

The commendation of Mr. Munson, expressed on his inspection of the vessel on February 22, 1931, the failure of the secretary of the respondent to voice any protest when he traveled on the vessel, and the letters of commendation from the respondent's agents at Nassau and Miami to the master, all tend to show unmistakably that the claim of alleged damages which it is now sought to offset first arose about the time when final settlement was due and the president of the libelant was unwilling to make a further deduction by exercising the option of taking redelivery a few days sooner than termination of the full charter time.

Of course, the respondent was not bound to reject the vessel in order to claim damages, but might accept her and retain its right to recover damages; but the agreement between the parties as to the cleaning, the performance of that agreement, and the continuance of the work in the face of the bad weather conditions, of the handicap of smoke from libelant's boat Montgomery, and the fact of continuous payment of charter hire without any protest up to the time the final payment was due, is persuasive evidence that, if there was a technical breach, it was waived.

The respondent is entitled to set off the sum amounting to $119.80 on account of the detention of the vessel at Miami, resulting from seizure by the marshal.

Clause 11 of the charter party provides, the "arrests and restraint of princes, rulers, and people" are "mutually excepted."

The arrest of a vessel under private legal process is not within the "restraint of princes," etc., exception. Poor on Charter Parties (2d Ed.) § 72; The Coventina (D. C.) 52 F. 156; Finlay v. Liverpool & Great Western S. S. Co., 23 Law Time Reports, 251.

If this alleged offset was for damages caused by failure to sail, or damages caused

to cargo by reason thereof, or because of delay in delivery, it could not be sustained, but I cannot hold that the charterer can be compelled to pay charter hire for the vessel when she could not be used because of the seizure by the marshal and .the absence of the master while arranging the bond, nor do I believe that the Harter Act (46 USCA §§ 190–195) can be so construed. The Brunswick (D. C.) 263 F. 907; The Estrada Palma (D. C.) 8 F.(2d) 103, cited on behalf of libelant, are not in point.

The testimony of the witness Albertie, of the Bank of Montreal, as to his telephone conversation with the representative of the respondent, although not of very great importance, was admissible. New York Life Ins. Co. v. Silverstein (C. C. A.) 53 F.(2d) 986; American & British Mfg. Corp. v. New Idria Q. Min. Co. (C. C. A.) 293 F. 509.

The decisions of the New York state courts are not binding, as the Act of Conformity, title 28, § 724, U. S. Code (28 US CA § 724), excepts admiralty causes, and in any event this court as an admiralty court is not bound by the strict common-law rules of evidence. The Rosalia (C. C. A.) 264 F. 285, 289.

I find as conclusions of law:

That the libelant fully performed all the agreements on its part to be performed of the charter party' dated November 30, 1930, in and by which the steamship New Northland was chartered to the respondent, and is entitled to recover from the respondent for charter hire $5,227.20, for balance of extra crew's wages or overtime, paid by libelant on respondent's account $708.41, and balance of inventory missing on redelivery of the steamship New Northland, $797.73, making $6,733.34 in all, less offsets in favor of the respondent against the libelant, of credit of $573.81 expended by respondent for libelant's account in the purchase of supplies, of credit of $146.70 for excess of fresh water on board on redelivery over the amount of fresh water on board on delivery, and of credit in favor of respondent against libelant for $119.80 on account of hire and fuel consumed on April 2, 1931, when the sailing of the vessel was delayed by the United States marshal under a seizure, making credits in all of $840.31, which, deducted from $6,733.34, leaves $5,893.03, the net amount for which libelant is entitled to recover.

That the respondent has failed to establish by a fair preponderance of the evidence the offset alleged by it of $6,000 for alleged various losses suffered by it, including the loss of passage moneys, freights, good will, etc.

That a decree may be entered in favor of the libelant against the respondent for $5,893.03, with interest thereon from the 15th day of April, 1931, together with the costs of this action.

Settle decree on notice.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty, proposed findings of fact and conclusions of law in accordance with this opinion may be submitted for the assistance of this court, as provided by the rules of this court.