## AMERICAN & BRITISH MFG. CORPORATION et al. v. NEW IDRIA QUICK-SILVER MINING CO.

(Circuit Court of Appeals, First Circuit. October 19, 1923.)

No. 1590.

1. Sales ⬖52(5)—Binding contract between two corporations held established by the evidence.

Evidence *held* to support a finding that a written contract between two corporations for the sale and purchase of a large quantity of quicksilver had become effective and binding by the assent thereto of officers duly authorized by defendant corporation.

2. Corporations ⬖406(3)—Letter assenting to contract written in behalf of corporation signed by assistant secretary held to warrant finding that it was authorized by executive officers.

A letter written from the New York office of a corporation giving final assent to an important contract and signed by the assistant secretary in charge of the correspondence of that office, who had been in the employ of the company for a good many years and had never been known to exceed her authority, taken in connection with other evidence in the case, *held* to warrant a jury in finding that it was authorized by the executive officers who had authority to make the contract.

3. Evidence ⬖148—Telephone messages held competent.

Telephone messages from a general office of a corporation relating to an important matter pending, and purporting to come from the corporation, *held* admissible in evidence, though the particular person speaking was not shown.

4. Trial ⬖349(2)—Requiring special findings by jury discretionary.

Whether a jury shall be required to make special findings is discretionary with the trial court.

5. Evidence ⬖389—Parol evidence held not admissible to contradict corporate record.

Where the record of a meeting of the board of directors of a corporation showed that a proposed written contract between it and plaintiff was read, and that a resolution was passed authorizing the officers to execute such contract, and a certified copy of such record was

⬖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

furnished to plaintiff before the contract was executed, parol evidence to show that the authority given the officers to execute the contract was conditional *held* properly excluded.

**6. Witnesses ⬤⟳406—Impeaching evidence held admissible.**

Where the authority of the assistant secretary of a corporation to act for the corporation was in issue, and the president testified that she had not signed contracts for the corporation, other contracts, similar to the one in suit, bearing her signature, which the witness identified, were admissible to contradict his testimony.

**7. Evidence ⬤⟳108—Evidence of plaintiff's motive in bringing suit held immaterial.**

Evidence offered to show that plaintiff did not bring the suit in good faith, but to take advantage of defendant's financial circumstances and force a settlement, *held* properly excluded as immaterial.

**8. Evidence ⬤⟳155(1)—Evidence in rebuttal admissible because of evidence introduced by defendant.**

Where defendant introduced evidence in support of its contention that plaintiff did not believe the contract sued on was binding, as evidenced by its delay of four years in bringing suit, plaintiff's corporate records, and testimony of its counsel showing that action was contemplated before but on advice of counsel was deferred because of defendant's financial condition, *held* admissible.

**9. Monopolies ⬤⟳17(1)—Contract made in furtherance of unlawful combination.**

Plaintiff corporation, which produced one-third of the quantity of quicksilver produced in the United States, made one of its stockholders and directors its agent for final approval of a contract with defendant for the sale at an enhanced price of all the quicksilver it had on hand and all it should produce in the year 1916. Defendant had formed a scheme to corner the market for that year by contracting for practically the entire product in the United States, and plaintiff's agent was a party to such plan and knew that the contract with plaintiff was dependent upon the securing of other similar contracts. He was also sales agent for plaintiff and in constant communication with its officers. *Held*, that plaintiff was charged with notice of the purpose of the contract, and that a jury would be warranted in finding that by its execution plaintiff became a party to the illegal combination.

**10. Corporations ⬤⟳457—Contract held not ultra vires.**

A contract for purchase of quicksilver *held* not ultra vires as to a corporation authorized by its charter, inter alia, to purchase and deal in ammunition and materials useful in its manufacture, and to buy and sell minerals.

**11. Sales ⬤⟳384(7)—Damages for breach of contract by purchaser.**

On breach by the purchaser of a contract for sale of a marketable commodity, it is the duty of the seller to market the product so left on its hands, and the measure of its damages is the difference between the contract price and the amount received therefor, less reasonable expenses of sale, which include commissions.

**12. Sales ⬤⟳71(4)—Contract for sale of future production of mine.**

Under a contract by plaintiff for sale of its entire production of quicksilver in 1916, "using due diligence to produce as much quicksilver as possible," the quantity embraced in the contract was that actually produced, though the production was increased over that of the previous year by the installation of new machinery, where the change was made in the exercise of ordinary business judgment and not fraudulently.

Anderson, Circuit Judge, dissenting in part.

In Error to the District Court of the United States for the District of Rhode Island; Arthur L. Brown, Judge.

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action at law by the New Idria Quicksilver Mining Company against the American & British Manufacturing Corporation and others. Judgment for plaintiff, and defendants bring error. Reversed and remanded.

William H. Griffin, of New York City (Ralph M. Greenlaw, of Providence, R. I., on the brief), for plaintiffs in error.

Charles F. Choate, Jr., of Boston, Mass. (Archibald MacLeish, of Boston, Mass., on the brief), for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. This is a writ of error to review a judgment of the District Court of Rhode Island in favor of the plaintiff. The action is assumpsit for breach of contract brought by the New Idria Quicksilver Mining Company, a Wyoming corporation, against the American & British Manufacturing Corporation, a New York corporation, having a place of business in Providence, R. I. The writ is dated the 1st day of October, 1920, and the suit was originally brought in the superior court for the county of Providence, and state of Rhode Island, and later removed by the defendant to the District Court.

December 20, 1920, the plaintiff, by a decree of the United States District Court for Massachusetts, was put into the hands of James D. Colt as receiver, who, being authorized to appear and prosecute this cause, on January 21, 1921, entered his appearance and undertook its prosecution. December 5, 1921, George C. Van Tuyl, Jr., having been appointed receiver of the defendant by the United States District Court for the Southern District of New York, was authorized to intervene as defendant in said action and on that date his intervention was allowed.

In its declaration the plaintiff alleges in substance that on the 18th day of January, 1916, it entered into a contract (Exhibit A) in the state of New York with the American & British Manufacturing Company, also a New York corporation, wherein the plaintiff sold, and the American & British Manufacturing Company bought, 740 flasks of quicksilver (less a possible deduction of 10 or 20 such flasks already sold or pledged, which deduction was actually 10 flasks) then in transit from California to New York, and all the quicksilver which the plaintiff should produce on any properties owned or controlled by it, from the date thereof, January 19, 1916, until January 1, 1917, at the price of $250 net cash per flask of 75 pounds net weight of quicksilver, upon the terms set forth in the contract (Exhibit A); and that said American & British Manufacturing Company agreed to take and pay for said quicksilver then in transit and to be produced at the price and on the terms aforesaid; that the plaintiff was ready and willing to do and perform all the obligations on its part to be performed, and on the 16th of February, 1916, tendered to the American & British Manufacturing Company in accordance with the terms of such contract 350 flasks of quicksilver, being a part of that hereinbefore referred to as being in transit at the time of the date of said contract, and demanded pay-

ment therefor in accordance with the terms of the contract; and at the same time the plaintiff notified the American & British Manufacturing Company in writing that 380 other such flasks of quicksilver, being the balance of the said 740 flasks less 10 flasks deducted to fill orders theretofore pledged, had arrived in New York, and that said plaintiff was prepared to deliver the same to the American & British Manufacturing Company upon payment therefor, and presented an invoice for the same to the American & British Manufacturing Company; but that it did not take and pay for said quicksilver so tendered, or any part thereof, but wholly failed so to do or to do or perform any of its agreements and covenants in the premises; that thereupon the plaintiff, in accordance with the terms of the contract, on February 23, 1916, gave notice in writing to the American & British Manufacturing Company that the plaintiff declared said contract to be of no further force and effect according to the terms of paragraph 7 thereof; that the plaintiff produced from all properties owned and controlled by it between the date of the contract and January 1, 1917, 10,828 flasks of quicksilver; that the plaintiff was obliged to sell and did sell such quicksilver, both that in transit and that thereafter produced, at a less price than that fixed by the contract, to its loss of $1,845,506.05, and also was put to great expense in handling, storing, insuring, and selling the same, and has lost the use of moneys which it was entitled to receive for the same under said contract, and has been otherwise damaged; that subsequently to the giving of notice in writing to the American & British Manufacturing Company in which the plaintiff declared said contract to be of no further force and effect as aforesaid, and before the commencement of this action, the defendant the American & British Manufacturing Corporation acquired all the property and assets of the American & British Manufacturing Company and as a part of the consideration thereof assumed all its obligations; that neither said American & British Manufacturing Company nor said defendant has ever performed any part of said contract or paid the plaintiff any part of its damages as aforesaid, but hitherto have both wholly failed so to do, to the damage of the plaintiff in the sum of $2,500,000.

The defendant pleaded the general issue and filed nine special pleas, in the first six of which it alleged in substance that the plaintiff ought not to maintain its action on the ground that, before the making of said writing or agreement sued on, if any such was made, the plaintiff and others purporting to act for the American & British Manufacturing Company corruptly and wrongfully agreed and conspired to buy up such large quantities of quicksilver as to obtain a monopoly of it for the purpose of selling it at an unreasonable and artificially enhanced price; that in pursuance of the said corrupt and unlawful agreement the plaintiff made and entered into said agreement, if any, with the American & British Manufacturing Company, and that such agreement, if any existed, is void, illegal and unlawful; that it was not only illegal and void at common law, but in violation of chapter 647, § 1, of the Act of the Congress of the United States, dated July 2, 1890 (Comp. St. § 8820), and of the statutes of the state of New York, where it is agreed the contract, if any existed, was made (General

Business Law [Consol. Laws, c. 20] §§ 340, 341, 342; Stock Corporation Law [Consol. Laws, c. 59] § 14; Penal Law [Consol. Laws, c. 40] § 580). In the last three special pleas the defendant alleged that the contract sued upon, if any there was, was executed for the purpose of reselling the aforesaid quicksilver at an unreasonable and artificially enhanced price and speculating in the same and was beyond the corporate powers of the American & British Manufacturing Company and was illegal and void, and that the plaintiff knew or had reasonable grounds to believe, or was possessed of facts sufficient to charge it with notice that the American & British Manufacturing Company entered into the aforesaid agreement, if any there was, for the purpose of reselling the quicksilver and speculating therein, and that said American & British Manufacturing Company was thereby exceeding its corporate powers in so doing.

The plaintiff filed a replication in which it denied the conspiracy; it further denied that in pursuance of the alleged conspiracy it made the agreement of January 18; it further denied that it knew or had reasonable grounds to believe or was possessed of facts sufficient to charge it with notice that the American & British Manufacturing Company executed the agreement of January 18 for the purpose of obtaining a monopoly of quicksilver so as to sell it at an unreasonable and artificially enhanced price. It also denied that the American & British Manufacturing Company was not authorized by law nor permitted by the terms of its charter to buy quicksilver or minerals, ores, or metals of any nature, kind, or description, except in aid of or in connection with the manufacture, purchase, or other acquisition of ordnance, ammunition, armament, guns, weapons, projectiles, etc., and denied that the contract of January 18 was illegal and void.

The defendant also filed a further plea in which it set out that the agreement was void as being in contravention of "Act 4166 of the General Laws of California, as amended up to the end of the extra session of 1916;" but as it is conceded that the contract was made and to be performed in New York, it is not deemed necessary to state further the matters alleged in this plea.

On December 16, 1921, the jury returned a verdict for the plaintiff in the sum of $1,803,364.05. After the verdict the defendant filed a motion for a new trial, which was denied, and then prosecuted this writ, alleging 316 assignments of error, in which it asserts that the court erred in refusing its motion for a directed verdict; in refusing to give certain requested instructions; in its charge as given; in the reception and rejection of evidence; and in its ruling that the defendant had failed to sustain by its proof the matters alleged in its special pleas.

[1] The principal question presented is whether there was any substantial evidence from which the jury was warranted in finding that the contract was consummated. The plaintiff's evidence tended to prove that, on January 18, 1916, duplicate instruments (Exhibit A) embodying the alleged agreement were drafted by plaintiff's attorney in California and there executed by the plaintiff, by its vice president and general manager, W. B. Buckminster; that thereafter these docu-

293 F.—33

ments were forwarded to Haas Bros. in New York (a California corporation and selling agent of the plaintiff, having a place of business in New York), with instructions to see that the contract was signed in duplicate, was duly authorized by resolution of the board of directors of the American & British Manufacturing Company, and that the guaranty annexed thereto for the fulfillment of the contract was executed by a satisfactory guarantor; that when these documents reached New York they were taken by Mr. Kalman Haas, of Haas Bros., Mr. Harold C. Buckminster, secretary of the plaintiff company, and Mr. Theodore Taft, its counsel, to Joseph H. Hoadley, through whom the negotiations leading up to the drafting of the instrument embodying the contract had been made and who had represented that he was acting therein as the authorized agent of the American & British Manufacturing Company. On January 24, 1916, the two documents were left with Mr. Hoadley upon his signing a receipt stating that the contracts were received in escrow and were not to be considered delivered until further notice from the plaintiff; and that, unless further authority was given, the contracts were to be returned to Mr. Haas. At a meeting of the board of directors of the American & British Manufacturing Company, held January 25, 1916, the two documents were presented and a resolution was passed authorizing the chairman of the board, A. H. Hoadley, to execute, acknowledge, and deliver the same to the plaintiff. The name of the American & British Manufacturing Company having been affixed to the two documents by A. H. Hoadley, chairman of the board, and attested by William E. White, secretary, they were, on January 25, 1916, delivered by the chairman to Joseph H. Hoadley, who secured the signature of the Lake Winnipeg Shipping Company, Limited, by Hugh Sutherland, president, as guarantor. Joseph H. Hoardley then delivered one copy of the contract thus executed, with a copy of the resolution of the board of directors attached, to Mr. Kalman Haas. The other copy was retained by him. On January 28, 1916, the plaintiff notified the American & British Manufacturing Company and Joseph H. Hoadley that the proposed guarantor was not satisfactory, that the negotiations were off, and demanded a return of the copy of the contract retained by Hoadley. No reply was received from either Hoadley or the American & British Manufacturing Company to this demand. Hoadley, however, later suggested other guarantors. In this situation, and being unable to obtain any further information from the American & British Manufacturing Company or Hoadley in regard to the matter, and being aware that the company might claim that the guarantor was satisfactory and that the plaintiff's nonacceptance of the guaranty was unreasonable (the first installment of quicksilver having then arrived in New York), the plaintiff, on the 16th day of February, 1916, wrote the American & British Manufacturing Company as follows:

"Gentlemen: In view of your failure to reply to our letter of January 28th, 1916, and the failure of Mr. Joseph H. Hoadley to return the copy of the proposed contract held by him, notwithstanding letters written to him demanding the return of the same to Mr. K. Haas, and the failure of all our many attempts to bring about a conference between you and ourselves, we are led to believe that you consider that paper as valid and binding.

"In order to avoid any possible misunderstanding, and to show our good faith, we herewith notify you that, if you consider the instrument dated January 18, 1916, an existing and valid contract, we are willing to reconsider our letter of January 28th, 1916, and to accept that instrument as a valid and binding contract and herewith tender to you, under the terms of that contract, 350 flasks of quicksilver, for which we present bill of lading, duly indorsed, with invoices therefor, amounting to $87,500.00 and we further tender you 359 flasks of quicksilver for which we present bill of lading, duly indorsed, with invoices therefor, amounting to $87,500, amounting in all to $175,000.00, and request the payment of same by certified check on any responsible bank or banking house in the city of New York payable in New York to Hass Bros., and upon payment as above, we will hand you documents as above.

"We further notify you that 380 flasks of quicksilver have arrived in New York, and we are prepared to deliver same to you, upon payment therefor, and herewith present invoices for same, amounting to $95,284.25 which includes freight to New York, and which flasks, together with the 350 flasks first above mentioned, constitute the 740 flasks mentioned in said paper of January 18, 1916, less ten (10) flasks deducted to fill orders theretofore pledged."

This letter was delivered by plaintiff's counsel, Mr. Taft, in person at the office of the American & British Manufacturing Company, 30 East Forty-Second street, New York City, at which time he tendered the bills of lading and invoices for the quicksilver. On the same day the plaintiff and Haas Bros. wrote Joseph H. Hoadley, inclosing a copy of the letter delivered at the office of the American & British Manufacturing Company, and stated the fact of the presentation of the letter and the tender of the invoices and bills of lading.

Although it is clear that the contract was not to be regarded as binding upon the plaintiff until after it gave notice that it was satisfied the contract had been properly signed and guaranteed, it is equally clear that the plaintiff, by its letter of February 16th, notified the American & British Manufacturing Company of its willingness to be bound by the contract as presented to it by Hoadley and waived its right to insist upon another and further guarantor. While the evidence from this point on as to the consummation of the contract was conflicting, the plaintiff's evidence tended to prove that on February 17, 1916, Joseph H. Hoadley called the office of Haas Bros. on the telephone, stating that the letter of February 16 had been received; that he had been unable to make reply up to that time, but that everything would be made satisfactory; that Haas replied that he was tired of promises and wanted the letter for which the plaintiff had asked, stating everything which the manufacturing company proposed to do; that in reply Hoadley promised to have a letter sent from the American & British Manufacturing Company stating when and in what manner it would take delivery of the quicksilver and make payment for it; that on the following day, Friday, February 18, 1916, a letter was received addressed to the plaintiff and Haas Bros., 61 Broadway, New York City, written on paper bearing the heading "American & British Manufacturing Company, 30 East Forty-Second street, New York," and signed "American & British Manufacturing Company, O. B. Corbin, Secretary," reading as follows:

"Gentlemen: Through our authorized agent, Mr. Joseph H. Hoadley, of New York, we have received your letter of February 16th, and beg to state that while our main office is in Providence, R. I., we accept your tender of invoices

and bills of lading as stated in your letter, providing said invoices and bills of lading represent the adequate amount of flasks of quicksilver represented by bills, for which we are to pay you specified amounts as stated in contract.

"Mr. A. H. Hoadley, chairman of the board of directors, in company with the treasurer, will call at your office, No. 61 Broadway, on Monday, February 21st, between one and three o'clock in the afternoon, to receive said invoices and bills of lading, and pay you the amount of your said bill in accordance with the contract.

"Thanking you for your kindness, and trusting that our relations under said contract will continue to be satisfactory, we are, etc."

In reply to the letter of the 18th, the plaintiff, on February 19, 1916, by its secretary, H. C. Buckminster, wrote and caused to be delivered to the American & British Manufacturing Company, at its office 30 East Forty-Second street, a letter reading as follows:

"Gentlemen: In reply to your letter of the 18th inst., delivered at the house of Mr. K. Haas, last evening, we beg to say that we shall expect your officers at the office of Haas Bros. on Monday the 21st inst., between one and three o'clock, p. m., to pay for the quicksilver tendered to you on the 16th inst. And we further beg to say that unless payment is made at that time we propose to declare the contract dated January 18th, 1916, of no further force or effect, in accordance with paragraph 7 thereof."

On the afternoon of February 21, Mr. Taft and other representatives of the plaintiff were at the office of Haas Bros. at 2 o'clock, and a message was received by telephone stating that the two gentlemen from Providence would be late, that their train was delayed, and they would be a little late in coming down to Mr. Haas' office. It also appeared that A. H. Hoadley, chairman, and William E. White, secretary and treasurer of the American & British Manufacturing Company, came up from Providence and were attending a meeting of the board of directors of the American & British Manufacturing Company at 2 o'clock that afternoon (February 21) at the office of the company, 30 East Forty-Second street. Mr. Taft and those with him, having waited at the office of Haas Bros. until 4 o'clock, caused the office of the British company to be called on the phone, and stated to them that the gentlemen had not arrived and received an answer (in the voice of the person that spoke over the telephone at 2 o'clock), that they had started 20 minutes before and might have stopped on their way down-town. No one, however, appeared. On February 23, the previous day being a holiday, the office of the American & British Manufacturing Company called the office of Haas Bros. on the telephone and stated that the contract was meeting with delay because of the death of Mrs. Hoadley (the wife of George Hoadley, a former president of the British company and brother of Joseph H. Hoadley and A. H. Hoadley, had died). On February 23 the plaintiff, by its secretary, H. C. Buckminster, sent a letter by messenger to the American & British Manufacturing Company, 30 East Forty-Second street, and a copy of the same to Mr. Joseph Hoadley, in which it stated that because of the failure of the American & British Manufacturing Company to make payment as required by the contract and as promised in their letter of the 18th inst., the plaintiff declared the contract to be of no further force and effect, according to the terms of paragraph 7 thereof. The seventh paragraph of the contract was as follows:

"In case of the breach of any of the covenants herein by either party hereto, the aggrieved party may, upon written notice, declare this agreement to be of no further force and effect, and may look for another seller or buyer as the case may be, but without waiving any rights of damage for such breach, or for the failure to duly perform all the covenants hereof."

There was also evidence that the defendant, which is a reorganization of the American & British Manufacturing Company, assumed the obligations of the latter, and it was not contested that that rendered the defendant responsible to the plaintiff in this action if a contract was consummated between the plaintiff and the American & British Manufacturing Company.

The plaintiff's evidence also tended to prove that of the 740 flasks in transit, 728 were tendered to the American & British Manufacturing Company, 2 of the 740 having been destroyed in transit, and that 10,450 more flasks were produced at the plaintiff's mine during the period covered by the contract, which at $250 a flask amounted to $2,797,000; that after the asserted breach of the alleged contract, the plaintiff sold the quicksilver and received therefor $947.395.85, leaving a balance of $1,849,604.15, with interest, as the plaintiff's loss.

The defendant's evidence tended to prove that the contract of January 18 was never consummated; that Joseph Hoadley, at the time he delivered the duplicate copy to Haas, stated that the contract was to take effect only in case the American & British Company also obtained certain quicksilver contracts for the output of other mines for 1916, and then only after ratification by that company; that while some of the other contracts were obtained, all of them were not, and ratification was not had.

It appears from the foregoing that the minds of the parties had met as to the terms of the proposed contract; that those terms were embodied in the instruments of January 18, 1916; that the plaintiff by its letter of February 16 made an unqualified offer to the American & British Manufacturing Company signifying its willingness to be bound by the contract as presented to it and waived its right to insist on any other or further guarantor; that if the letter of February 18, 1916, was authorized or approved by the officers of the American & British Company, there was sufficient evidence from which the jury might find that that company, by the letter of February 18, accepted the plaintiff's offer of February 16, and that the instrument of January 18 thereupon became a consummated and binding obligation; that the delivery of that instrument by Joseph H. Hoadley on January 25 to the plaintiff's representative was unconditional, or, if conditional, that the condition was waived by the letter of February 18, whereby the company ascepted the plaintiff's offer, and accepted the tender of the invoices and bills of lading made on February 16 of the flasks of quicksilver that had arrived and were in transit, providing said invoices and bills of lading represented the adequate amount of flasks of quicksilver for which the American & British Manufacturing Company was to pay the plaintiff the specified amounts stated in the contract, which the evidence showed they did.

[2] The defendant, however, contends, that the letter of February 18th was unauthorized and because of this was improperly received in

evidence; that O. B. Corbin, who signed herself as secretary of the American & British Manufacturing Company, was simply the assistant secretary of that company and as such was without authority to sign a letter consummating a contract of this character.

As to this matter it appeared that Miss Corbin, who signed the letter as secretary, had been a trusted employee of the American & British Manufacturing Company for a long series of years and practically in charge of its matters at its New York office. As assistant secretary she had charge of the correspondence at that office, and it was her duty to call the attention of the managing officers of the company to letters of importance like the one of February 16, and not to sign a letter like that of February 18 without authority from them to do so. While her memory was faulty as to signing the letter of February 18, she testified that she never signed an important matter of that kind unless she got instructions from some officer. The evidence was that she was entirely reliable and obeyed orders. A. H. Hoadley, chairman of the board of directors of the American & British Manufacturing Company and its general manager, testified that in the ordinary course of business a letter addressed to the American & British Manufacturing Company about an important matter, received at the New York office, would be brought to his attention; that the New York office would not reply to an important letter without authority from him; that Miss Corbin had been in the company's employ a good many years, but would not have held her place very long if she was writing letters she was not authorized to do; and that if she had disobeyed orders she would have been discharged.

Under the circumstances it was competent for the jury to find that the letter of February 16 was brought to the attention of the managing officers of the American & British Manufacturing Company and that Miss Corbin signed the letter of February 18 on behalf of that company with the approval of its managing officer or officers. 'The New York office was in frequent communication by phone and otherwise with the Providence office of the company, and there is specific evidence that on February 18 there was a stockholders' meeting at the New York Forty-Second street office of the company, that A. H. Hoadley, its general manager, and W. E. White, its secretary and treasurer, usually were present at such meetings, and that on the 21st of February the board of directors of the company were in session at its New York office; that A. H. Hoadley and W. E. White were in attendance; that the board that day passed resolutions approving and directing the signing of quicksilver contracts procured by Joseph Hoadley for the output of another mine at $275 per flask, an increase of $25 per flask over the price called for in the contract with the plaintiff; and it is reasonable to infer that on these occasions, if not at an earlier date, they were informed of such an important matter as that under consideration in the letters of February 16 and 18 and either directed or acquiesced in the signing of the letter of February 18. The state of mind of these officers in regard to this matter is not only to be gathered from the general situation surrounding them at or about this time, but from the fact that they were then signing other contracts

for quicksilver, in large amounts and at an increased price, procured by Joseph H. Hoadley in pursuance of his and their scheme to corner the market, and that, at the same time, they were retaining in their control the contract for plaintiff's output, notwithstanding plaintiff's demand for its return, knowing, as they must, that without the contract for plaintiff's output they could not obtain a control of the market.

[3] Now as to the competency of the telephone messages: W. A. Duncan, who was associated with Haas Bros. at their office in New York, testified that on February 17, 1916, the office of Haas Bros. was called on the phone, and the party on the other end represented himself as Joseph H. Hoadley; that he (Duncan) answered the call; that he took one receiver and Mr. Haas the other; that Mr. Hoadley explained to Mr. Haas that he had received the letter of February 16; that no reply had been made as he had been unable to make a reply up to that time, but that everything would be made satisfactory; that Haas replied that he was tired of promises, that he wanted the letter for which he had asked, stating everything they proposed to do, and that was the only way he wanted it made satisfactory; that Hoadley in his reply promised to have a letter sent from the main office of the company explaining when and in what manner they would take delivery of the quicksilver and make payment for it. Mr. Joseph Hoadley was the party through whom the preliminary negotiations leading up to the drafting of the instrument of January 18 were made. He was the party to whom the two instruments of January 18 were delivered to be signed by the American & British Manufacturing Company and was the party by whom, after the signatures were attached in pursuance of the resolution of its board of directors, the guaranty was obtained and one of the copies returned to the plaintiff's representative; and we think this telephone communication, when taken in connection with the letter of February 18 and other evidence in the case, was competent.

As to the two telephone messages of February 21, Mr. Taft testified that, in pursuance of the arrangement specified in the letter of February 19, in which the plaintiff in answer to the letter of February 18 had notified the American & British Manufacturing Company that it would expect the latter's officers at the office of Haas Bros. on Monday, the 21st of February, between 1 and 3 o'clock p. m., to pay for the quicksilver tendered on the 16th, he went to the office of Haas Bros. and was there at 2 o'clock and remained until 5; that during the afternoon a telephone communication was received with respect to the coming of these gentlemen for whom the appointment was made; that he took one of the receivers; that a voice at the other end said that the two men from Providence would be late, that their train was delayed, and that they would be a little late in coming down to Mr. Haas' office; that at 4 o'clock he caused the American & British Manufacturing Company to be called up, and that when connection was made he went to the phone and stated that these gentlemen had not arrived and received the reply that they had started 20 minutes before and might have stopped on their way downtown; that the party speaking on that occasion was the same party that spoke over the phone on the previous occasion that afternoon; and that the conversation related to the same subject-mat-

ter. The evidence showed that both conversations were had with the office of the American & British Manufacturing Company and the subject-matter of them related to the arrangement specified in the letters of February 18 to 19. We think these telephone conversations were properly received in evidence. The evidence did not show conclusively the source from which the telephone messages came, but was sufficient to sustain a finding that they came from the American & British Manufacturing Company. Commonwealth v. Robinson, 146 Mass. 571, 580, 16 N. E. 452; Coghlan v. White, 236 Mass. 165, 128 N. E. 33; Lord Electric Co. v. Morrill, 178 Mass. 304, 59 N. E. 807; Wolfe v. Missouri Pac. Ry. Co., 97 Mo. 473, 11 S. W. 49, 3 L. R. A. 539, 10 Am. St. Rep. 331; Jaques v. Chandler, 73 N. H. 376, 62 Atl. 713; Colburn v. Groton, 66 N. H. 151, 154, 28 Atl. 95, 22 L. R. A. 763; Holzhauer v. Sheeny, 127 Ky. 28, 104 S. W. 1034; General Hospital Soc. v. New Haven Rendering Co., 79 Conn. 581, 582, 65 Atl. 1065, 118 Am. St. Rep. 173, 9 Ann. Cas. 168; Chubb v. Sadler (C. C. A.) 284 Fed. 710; Chamberlayne, Evidence, § 1741c; Wigmore's Evidence, §§ 2129, 2155, 2550; 22 C. J. 193, 194.

We are also of the opinion that the telephone message of February 23 from the office of the American & British Manufacturing Company on Forty-Second street, saying that the contract was meeting with delay because of the death of Mrs. Hoadley and would be fixed up in a day or two, stands the same as the telephone messages previously considered and was properly received.

The defendant also assigned error in the admission of the document of January 18, 1916 (Exhibit A or 3). This document contained evidence of the most important character. It was one of the transactions leading up to the consummation of the contract and was competent. The question whether the terms embraced in the document of January 18, 1916, ever ripened into a binding contract was one of fact for the jury, and the court was clearly right in refusing to rule, as a matter of law, that there was no contract.

In what has been said, we have disposed of assignments of error Nos. 2, 7, 9, 10, 11, 15, 16, 17, 269, 272, and 301.

Closely related to the questions already considered and bearing upon the consummation of the contract, the defendant assigned certain errors to the rulings of the court in the denial of requests to charge, the giving of requests with modifications, and to the charge as given, which are covered by assignments Nos. 274, 275, 276, 277, 278, 280, 286, 287, 288, 289, 293, 294, 295, 296, 302, 308, and 309.

The letter of February 18, 1916, specifically accepted the tender made by the plaintiff on the 16th to the American & British Manufacturing Company, provided the bills of lading and invoices represented the flasks of quicksilver called for in the contract and with which, as above pointed out, the evidence shows they did. And the reasonable inference to be drawn from the language of that letter is an acceptance of the offer embodied in the letter of February 16. The court, therefore, properly refused the defendant's ninth request, which was the error complained of in assignment No. 274.

In its thirteenth request, the defendant asked the court to instruct the jury that—

"The authority of Miss Corbin as assistant secretary of the American & British Manufacturing Company to write the letter of February 18, 1916, Plaintiff's Exhibit 10, will not be presumed but must be proved."

The court gave this instruction and added:

"But it may be proven by circumstantial evidence and by all the surrounding conditions under which the document was written."

There was no error in this. The additional instruction was essential to relieve the jury from possible misunderstanding. This matter is covered by assignments of error Nos. 275 and 276.

In the fifteenth request, the subject-matter of the 277th assignment, the court was asked to instruct the jury that there could be no binding contract between the parties under the letters of February 16 and 18, 1916, until the American & British Manufacturing Company had accepted the bills of lading and paid the amount of the invoices. This clearly was not a correct construction of those documents, for the payment of the invoices was not a prerequisite to the acceptance of the proposition contained in the letter of February 16. The defendant takes nothing by this assignment of error.

The sixteenth request, constituting assignment No. 278, called upon the court to rule as a matter of law that the delivery of the contract of January 18 by the American & British Manufacturing Company to the plaintiff was conditional, whereas on the evidence whether its delivery was conditional or otherwise was one of fact for the jury. The defendant takes nothing by this assignment.

The eighteenth request, constituting assignment No. 280, was that any contract founded on the letters of February 16 and 18 was not authorized by the corporate action of the American & British Manufacturing Company and was of no force and validity. By this request the defendant asked the court to rule as a matter of law that the corporate action of the board of directors of January 25, 1916, authorizing the execution and delivery of the contract, was not sufficient, even though the managing officer or officers of the company sent or caused to be sent the letter of February 18 accepting the proposition contained in the letter of February 16, which was clearly not so. The defendant takes nothing by this assignment of error.

The twenty-sixth request, comprising assignments Nos. 286 and 287, asked for an instructed verdict for the defendant provided the jury took a certain view of the evidence as to the delivery of the document of January 18 by the American & British Manufacturing Company to the plaintiff, which took place on January 25, and this without regard to what subsequently took place between the parties as disclosed in the letters of February 16 and 18. Such an instruction would have been erroneous, for, if the delivery of the 25th of January was conditional, this condition could have been found to have been waived by the subsequent acts of the parties, and, if so, the defendant would not be entitled to a directed verdict. The defendant takes nothing by these assignments of error.

The twenty-ninth request, assignment of error No. 289, stands like the twenty-sixth. It relates to the delivery of the proposed contract dated January 18, 1916, and while it omits the words "on or about Jan-

uary 25, 1916," inferentially it embodies them and asks for an instructed verdict for the defendant on a portion of the evidence which was not necessarily controlling, as above pointed out.

In the twenty-eighth request, the subject-matter of assignment No. 288, the court was asked to charge:

"If the jury find that Miss Corbin was without authority to sign and send the letter of February 28 [18], 1916, your verdict must be for the defendant."

This request was denied on the ground that it was covered in substance by the instructions given to the jury requiring them to find whether the letter of February 18, 1916, was authorized. The jury had been instructed that it was essential for them to find that the letter of February 18 was authorized in order to find an acceptance of the proposition contained in the letter of February 16, and that they were to consider all the evidence bearing on that question. The defendant takes nothing by this assignment.

The defendant's thirty-second request, the subject-matter of assignments Nos. 293 and 294, was:

"If the jury find that any asserted contract based upon the letters of February 16, 1916, Plaintiff's Exhibit 8, and February 18, 1916, Plaintiff's Exhibit 10, was not authorized within the terms and provisions of the corporate action taken by the American & British Manufacturing Company in respect thereof, your verdict must be for the defendant."

This request was given, the court adding:

"I so charge having already called the attention of the jury to the scope of the corporate action in authorizing the execution and delivery of these contracts."

In the absence of this additional instruction the request might properly have been denied, as without qualification it would have tended to confuse and mislead.

The thirty-third request, the subject-matter of assignments Nos. 295 and 296, was:

"If the jury find that Miss Corbin received no authority to sign the letter of February 18, 1916, Plaintiff's Exhibit 10, except the request of the witness J. P. Flynn, your verdict must be for the defendant."

As to this the court charged the jury:

"If you find that Miss Corbin had no authority except that given her by Flynn and that letter was not brought to the attention of the parties or ratified, then * * * the verdict must be for the defendant."

This instruction was all the defendant was entitled to.

The thirty-first request, the subject-matter of assignments Nos. 308 and 309, was:

"If the jury find that any asserted contract based upon the letters of February 16, 1916, Plaintiff's Exhibit 8, and February 18, 1916, Plaintiff's Exhibit 10, was not authorized by proper corporate action of the American & British Manufacturing Corporation, your verdict must be for the defendant."

This request differs little in language and none in meaning from the thirty-second, except that the corporate action spoken of in the thirty-first request is that of the American & British Manufacturing Corpora-

tion and not that of the American & British Manufacturing Company. As this request (31) was worded it was clearly improper. At any rate, it was given in substance in the thirty-second request. It was not necessary that the letter of February 18 should be specifically authorized by the board of directors. The board of directors of the American & British Manufacturing Company had previously authorized the execution and delivery of the instrument of January 18, and the letter of February 18, referred to in the request, if sent with the approval of its officers, was evidence of their acts in behalf of the company in the consummation of the contract. The defendant takes nothing by this assignment.

In the 302d assignment the defendant complains that the court erred in its charge to the jury:

"If you find that that proposition—that is, the letter of February 16—was accepted, then there has been a breach of contract for which the defendant is liable in damages."

When the defendant proposed an exception to this portion of the charge, the court asked: "Is there any dispute that if there was a contract there was a breach?" And the defendant answered, "No." Under these circumstances the defendant takes nothing by this assignment.

[4] In its 307th assignment the defendant complains of the court's refusal to submit the following special findings to the jury:

"Did plaintiff and American & British Manufacturing Company deliver and exchange duplicate copies of the paper writing dated January 18, 1916, unconditionally and with the intention and purpose that the same should be in force and effect as a valid and binding contract?"

It was discretionary with the trial court whether it would require the jury to return special findings. No question of law is presented by this assignment. Parsons v. Trowbridge, 226 Fed. 15, 19, 140 C. C. A. 310, Ann. Cas. 1917C, 750; Mutual Accident Ass'n v. Barry, 131 U. S. 100, 119, 120, 9 Sup. Ct. 755, 33 L. Ed. 60.

[5] By assignments Nos. 18, 19, 20, 26, 27, and 28 the defendant complains of the exclusion of answers to certain questions propounded to witnesses Joseph H. Hoadley, B. A. Bouchie, William E. White, and A. H. Hoadley. Referring to the meeting of the board of directors of the manufacturing company on the 25th of January, 1916, the subject-matter of assignment 18, Mr. Joseph H. Hoadley was asked:

"Q. 147. Will you state what part you took in that meeting, what you said and what was said by others?"

On the question being objected to by plaintiff's counsel, the defendant replied in substance that it was offered to show that the board of directors authorized a conditional delivery of the contract. The court excluded the question on the ground that the defendant having put out a certified copy of the record of the board of directors to be acted upon by the plaintiff, as the evidence showed this resolution of the board of directors had been, the record could not be nullified by informal, unrecorded corporate action which had not been communicated to the plaintiff.

In the nineteenth assignment the question was:

"Q. 141. Mr. Hoadley, after the resolution of the board of directors was passed at the meeting of January 25th which has been offered in evidence in regard to the New Idria Company's proposed contract, did there anything take place with regard to the delivery of that contract?"

As to this question counsel for the defendant explained that he was attempting to bring out by it conversation or statements that took place with regard to the delivery of the contract, at the meeting of the board. The question was excluded for the same reason as question 147.

The question put to the same witness, referred to in the twentieth assignment, was:

"Q. 149. Was any formal or informal action taken by the board of directors with regard to the delivery of these contracts after the passing of the resolution?"

This question also was ruled out for the same reason above given.

It will be recalled that when the contract was delivered to Haas for the plaintiff on the 25th of January by Hoadley, it had annexed to it a certified copy of the vote of the manufacturing company's directors which had been passed at the meeting held that day. This vote read as follows:

"The chairman of the board presented a form of contract between New Idria Quicksilver Mining Company and this company, dated the 18th day of January, 1916, for the sale to and purchase by this company of quicksilver, and which contract was read to the board of directors. Upon motion of Mr. White, seconded by Mr. Macready, it was resolved that the company enter into said contract and that the chairman of the board be and hereby is authorized to execute said contract in the name of this company and acknowledge and deliver the same to New Idria Quicksilver Mining Company."

What the defendant was endeavoring to do in asking this question and prior questions, was, to quote counsel's own language, to "show that the board of directors authorized a conditional delivery of this contract." The purpose for which the question was asked was a sufficient reason for its exclusion. It was an attempt to contradict the unconditional resolution passed at the board meeting and which was delivered that day to the plaintiff with the intention that it should be acted upon and which was acted upon. There was no proof or offer of proof that Haas or the plaintiff was informed that the board had taken any informal action with relation to the delivery of the contract. The only action of the board of directors that was called to Haas' attention by Hoadley when the contract of January 18 was delivered was the formal action of the board embodied in the unconditional resolution. It is true that Hoadley testified that when he delivered the contract of January 18 to Haas on the 25th he stated that it would not become effective until the contracts for the output of the other mines were obtained and the matter was reported back to the company for its approval; but no information was given to Haas that such a condition was imposed by the board of directors. He had a right to understand, having received the formal unconditional resolution of the board of directors, that the condition stated by Hoadley, if it was a condition to the consummation of the contract, was one imposed by him or some

officer of the company charged with the delivery and consummation of the contract under the unconditional resolution, in the absence of any statement that it was imposed by the board of directors. The evidence sought to be elicited by these questions was properly excluded.

The questions raised by the twenty-sixth, twenty-seventh, and twenty-eighth assignments differ in no particular respect from those raised by the eighteenth, nineteenth, and twentieth. In these, as in the matter relied on in Nos. 18, 19, and 20, the defendant sought to contradict the vote of the board of directors of the 25th of January, and the court ruled that it could not be done. The defendant takes nothing by these assignments.

[6] In assignments Nos. 29 and 30 the defendant questions the admissibility of two contracts for quicksilver between the McNear and Innes companies and assigned by the McNear Company to the American & British Manufacturing Company, dated January 28, 1916, and February 9, 1916. These contracts were signed by O. B. Corbin for the manufacturing company under a resolution of the board of directors of February 21, 1916. A. H. Hoadley, a witness called by the defendant, on direct examination testified that Miss Corbin had never to his knowledge signed contracts for the manufacturing company, and on cross-examination he denied that Miss Corbin signed contracts for the company in February, 1916. He was then shown Miss Corbin's signature on these two contracts which he identified, as well as his own. They were properly admitted in evidence to contradict the witness' testimony, and were no doubt competent also for the purpose of showing the intent with which the American & British Manufacturing Company retained in its control the contract of January 18, 1916, if not for other purposes.

[7] In assignment No. 268 the defendant complains of the exclusion of an offer of proof that this suit was brought at a time when the defendant contemplated a note issue of $750,000, for the purpose of raising further capital, and prevented its accomplishment. The evidence was offered to show that the plaintiff did not believe that it had a cause of action and merely brought suit to force a settlement. The court ruled that the "belief of the parties at the time they filed their suits" was immaterial, and excluded the evidence. We think the ruling was right.

[8] In assignments Nos. 260, 261, 263, 264, and 266, the defendant complains of the admission in evidence, through the witness J. B. Colt, plaintiff's receiver and former attorney, of certain extracts from the records of the directors' meetings of the plaintiff company dated June 20, 1917, and March 26, 1918, and the refusal of the court to strike out those extracts and to allowing the witness to testify in respect thereto. It appeared that papers touching the contract between the plaintiff and the manufacturing company had been submitted to the attorney prior to March, 1918, and that in March he advised the plaintiff's directors against legal action because of the financial condition of the manufacturing company at that time; that they had better delay until it was in a better financial condition. The extracts from the directors' meetings in June, 1917, and March, 1918, related to retaining counsel for the purpose of bringing suit against the manufacturing

company. This evidence was all offered in rebuttal. The defendant had offered proof in defense of the action that the plaintiff's delay in bringing suit for about four years indicated that it believed that no contract existed between it and the manufacturing company, and the defendant's counsel stated that he intended to argue that the delay in bringing suit was a recognition on the part of the plaintiff of the nonexistence of the contract. The evidence was properly received.

[9] Now as to the conspiracy defense: The evidence showed that the negotiations leading up to the drafting of the contract of January 18 were conducted by Joseph H. Hoadley from New York through one McNear in California, the plaintiff being represented there by Haas Bros. and by W. B. Buckminster, its vice president and general manager; that the negotiations began about January 6, and that on January 16, in answer to a telegram and in confirmation of a telephone conversation, Joseph H. Hoadley, signing himself as "Authorized Agent for American & British Mfg. Co.," sent a telegram to McNear, his representative in California, reading as follows:

"Your telegram received also confirming telephone conversation stop contract in name of American & British Manufacturing Company New York state corporation for entire product including seven hundred and forty flasks in transit at two hundred and fifty dollars per flask company named highest credit will furnish any bank guarantee required stop name agents transit stuff is consigned to and have them deliver to me Netherlands Hotel and receive money on arrival stop Await further directions for future shipments."

The evidence further showed that on January 18, 1916, the terms of the contract were reduced to writing in California (the contract having been authorized by a vote of the board of directors of the plaintiff in Boston on January 17; see Record, p. 136, for vote, and pages 713, 714, for telegram of January 17), sent to Haas Bros. in California with directions to forward the same to Kalman Haas accompanied by instructions to procure the signature of the American & British Manufacturing Company, a vote of its board of directors authorizing the same, and a guarantor satisfactory to Kalman Haas, Haas Bros.' New York representative. The duplicate contracts having been sent across the country to New York were, on the 25th of January, there delivered by Kalman Haas to Joseph H. Hoadley to be signed, etc., who gave a receipt which stated that he received them "in escrow to have the same signed by Am. & British Manufacturing Co. These contracts are not to be considered delivered until further notice of the New Idria Quicksilver Mining Co. and unless further authority is given by said company contracts are to be returned to said Mr. K. Haas." At the time of the trial Kalman Haas was dead. Haas Bros. is a corporation and was the plaintiff's selling agent.

The defendant in support of its conspiracy defense introduced evidence tending to show that Joseph H. Hoadley, on January 14 and January 16, had interviews with Kalman Haas in New York in which Hoadley informed him of the scheme which he and others had formed to monopolize the supply of quicksilver in this country; that they went into the matter in detail, figuring possible profits, etc.; that it was agreed between them that Haas should have 2½ per cent. commission on all quicksilver purchased from the plaintiff and upon all of that

purchased from other mines; that he should also have a commission of 2½ per cent. upon the sales of all quicksilver so purchased; that Haas would not commit the plaintiff to the proposed contract for the sale of its output unless the commissions were agreed to nor unless Hoadley obtained contracts with all the other mines for their 1916 product so that there would be an absolute control of the entire product.

By assignments of error Nos. 270 and 299 the defendant complains that the court erred in not submitting this defense to the jury and in ruling that the defendant had not maintained either one of its pleas as to this matter; and by assignment No. 271 that the court erred in ruling that there was not sufficient evidence to show that the plaintiff participated in an illegal conspiracy to monopolize the supply of quicksilver and that the mere knowledge of Mr. Haas was not evidence of its communication to the plaintiff; and by assignment No. 306 that the court erred in ruling that plaintiff's knowledge of an illegal purpose was not a sufficient reason to justify the defendant in setting up the defense of illegality.

While there was abundant evidence that Joseph H. Hoadley and the manufacturing company had conspired to corner the market in quicksilver for the year 1916, there was no direct evidence that the claimed understanding arrived at between Hoadley and Haas, at these interviews in January, as to cornering the market, were communicated to the plaintiff. There was, however, evidence that Haas was a stockholder and director in the New Idria Company; that he knew and agreed to the price of $250 a flask fixed in the contract of January 18; that he was in frequent communication with Haas Bros. in California and with Harold Buckminster, the New Idria's secretary in Massachusetts; that the price of $250 a flask was abnormal and largely in excess of any price paid therefor prior to Hoadley's manipulation of the market; that there were few quicksilver producing mines in the whole country; and that the New Idria was the largest of these, producing one-third of all the quicksilver produced in the United States and one-half of that produced in California.

The plaintiff's position is that the arrangement which Haas entered into with Hoadley in the January interviews was antagonistic to the plaintiff's interest, and therefore his knowledge was not the plaintiff's knowledge, as it could not be presumed that he would communicate the arrangement to the plaintiff.

But on the above evidence alone we think it might be found not only that the plaintiff knew that the manufacturing company, through Joseph H. Hoadley, was attempting to create a corner in quicksilver, but that it intended, by its contract of January 18, to sell to the manufacturing company all the output of its mine for the year 1916 and all the spot quicksilver that it then had on hand, and thereby assist the manufacturing company in creating a corner. It knew that unless it agreed to sell the output of its mines to the manufacturing company a corner in quicksilver could not be created, and in view of the foregoing facts and circumstances it might be inferred that it was the purpose of the plaintiff in entering into the contract to aid the manufacturing company in furthering its scheme.

There was also evidence that Kalman Haas was the special agent of the plaintiff in the matter of the final approval and consummation of the contract; that it was not to be consummated, so far as the plaintiff was concerned, without his approval of the guaranty which the defendant was to furnish, etc.; and that he was the party to whom Joseph H. Hoadley or the manufacturing company was to deliver the contract for approval after the latter had authorized and signed the same. And there was further evidence that, after the passage of the resolution of January 25, the signing of the contract by the manufacturing company, and the acquisition of the guaranty, Hoadley, on delivering the contract to Haas, told him to investigate the responsibility of the guaranty and hold the contract until he (Hoadley) could get the American & British Company to ratify it, "which wouldn't be done until he had rounded up the other contemplated contracts that he had been negotiating on in order to get the complete output of 1916." In other words, there was evidence from which it might be found that Hoadley, on delivering the contract to Haas, made its consummation, so far as the manufacturing company was concerned, conditional upon his getting in the output of all the mines for the year 1916, and the subsequent ratification by his company. Notice to Haas that the acquisition of the proposed corner was a condition to the ratification of the contract by the manufacturing company was, under the circumstances, notice to the plaintiff, and its endeavor to consummate the contract thereafter was evidence of its co-operation in the scheme to corner the market.

In assignments of error Nos. 22, 34, 36, 38, 57, 58, 59, 60, 61, 68, 72, 73, 74, 76, 89, 90, 91, 92, 99, 119, 120, 121, 123, 127, 128, 134, 135, 139, 141, 144, 147, 148, 150, 168, 172, 173, 174, 175, 176, 178, 179, 183, 184, 185, 186, 187, 188, 189, and 190, the defendant complains of rulings of the court excluding conversations between Hoadley and his agents and persons disassociated from the plaintiff engaged in the purchase or sale of quicksilver. The exclusion of this evidence was also error, as there was evidence from which it could have been found that the plaintiff was a coconspirator with Hoadley and the manufacturing company.

[10] In the 300th assignment the defendant complains that the court erred in ruling that it had not made out its plea of ultra vires. By its charter the American & British Manufacturing Company was authorized "to manufacture, purchase or otherwise acquire, and to deal in, repair, sell and otherwise dispose of, ordnance, ammunition, armament, guns, weapons and projectiles of all kinds, and also all kinds of engines, motors, machines, machinery and tools, and also to manufacture, purchase or otherwise acquire, and to deal in, use, sell and otherwise dispose of materials and products useful in the manufacture or repair of any of the foregoing." There was a further provision in the charter reading as follows:

"In aid of, or in connection with, the foregoing, or in the use, management, improvement or disposition of its property and in addition to all other powers conferred by law the corporation shall have also the following powers:

"To mine, quarry, extract, dig, cut, reduce, treat, prepare for use, buy and sell ores, minerals, metals, wood, coal, stone, peat, marl, clay, oil, gas and raw materials generally and their products."

The defendant's evidence was that the manufacturing company was engaged only in the business of manufacturing ordnance, guns, and the steel part of projectiles in its plant in Bridgeport, and engines, machines, machinery, and tools at its plant in Providence; that it never engaged in the manufacture of ammunition and never at any time used quicksilver in any of its business operations; and its contention was that under its charter the power to buy and sell ores, minerals, etc., was only in aid of or in connection with the purposes named in the first paragraph above quoted. But we think the first paragraph explicitly gave it authority, not only to buy and sell ammunition, but also to buy and sell materials and products useful in the manufacture of ammunition, and that, as quicksilver is useful in the manufacture of ammunition, it had ample authority to buy and sell it if it saw fit. The construction of the charter was for the court.

[11] In assignments Nos. 310, 313, and 314, the defendant complains that the court erred in admitting in evidence the testimony of H. B. Baker concerning a tabulation of the amount received by the plaintiff from Haas Bros. for quicksilver produced in 1916; in admitting Exhibit 16 as a chart or tabulation of damages; and in refusing to strike out the testimony of Baker concerning the tabulation. The defendant's first objection to the statement of damages as contained in the chart is that it was not chargeable with a commission on the sale of the quicksilver made by the plaintiff after the manufacturing company breached the contract. This, however, is a misstatement of the situation. It was the plaintiff's duty, the manufacturing company having broken the contract, to reduce its damages by selling the product left on its hands, and the manufacturing company was entitled to the benefit of the proceeds less reasonable expenses incurred in making the sale, which would include commissions. The court in instructing the jury on the question of damages said:

"The rule of damages is compensation for what the plaintiff lost. The plaintiff had a contract which entitled him to receive a certain sum of money for this quicksilver. Upon a breach it was under the obligation of disposing of—it had a right to dispose of the article in the market at such fair price as it could get. It was under the obligation to exercise diligence to reduce the damages and to procure as good a return upon the quicksilver as possible. You have heard the testimony as to the amounts for which this was sold and as to the times at which it was sold. You have had the computations and you are to arrive at such sum as will be a just compensation to the plaintiff for any loss they have proven to you that it suffered by reason of its inability to get as good a price as that called for by the contract.

"It has been called to your attention, gentlemen, that some of the quicksilver sold was at higher prices than those provided in the contract. Of course, where a man has goods thrown upon his hands and can get a higher price for them, he can have nominal damages of one dollar for breach of contract and that is all, because he profited financially by a breach of the contract. But if he gets more, he credits the other side with what he has received, and in those cases where he gets less he claims the difference—compensation, gentlemen, for the loss of the value of this contract."

The defendant further objected to the reception of this tabulation on the ground that 120 flasks were included in it that should not have been. The evidence bearing on the question whether the 120 flasks should or should not have been included in the tabulation was intro-

duced before the jury. The tabulation was submitted merely as a chalk to aid the jury in keeping the figures in mind. The court allowed the exhibit to go to the jury, stating:

"If there are any minor errors, if there was a wrong credit that will be for the jury to determine as a matter of fact on the testimony. I do not think I would be justified in determining it as a matter of law."

The jury had all the evidence before it and was instructed to give only just compensation, and as the defendant was given a credit of some $12,000 in excess of $30,000 at which the 120 flasks at $250 per flask would come to, we do not think the defendant was harmed in the matter of which it now complains.

The defendant also objects to the tabulation on the ground that it included certain flasks which did not enter into the production of 1916 covered by the contract, but was a part of the 1917 production. The evidence as to all this was thoroughly gone into before the jury and, while the defendant made this claim, the plaintiff's evidence tended to show that the items in question were a part of the 1916 production under the contract. It was all a matter for the jury.

[12] In assignments Nos. 297 and 298 the defendant complains of the court's refusal to charge the jury:

"The jury cannot award plaintiff any damage arising out of increased production resulting from installation of new mill, aerial tramway, and new development work in 1916 after February 23, 1916."

And to its charge as follows:

"I will say this, gentlemen, that the contract according to its terms calls for the production of 1916, and if the plaintiff should increase its production to such an unreasonable extent as to indicate fraudulent action upon its part, you would not consider that increased production, but any ordinary increase due to ordinary matters, within the ordinary business judgment of the board of directors if resulting in an increase, would not preclude the plaintiff from getting damages for its action."

In support of its exception, the defendant claims that the evidence showed that substantial increase was effected as a result of the installation of a new mill and tramway which was put in to take the place of mules and hand labor, there being a shortage of hand labor, and refers to the evidence where it states that 6,250 flasks were produced in 1915, and 6,550 in 1914, but omits to call attention to evidence showing that in 1913 the production was 8,700 flasks; in 1912, 9,600; in 1911, 9,-750; and in 1910, 10,800 flasks. The evidence taken as a whole does not show that the plaintiff's production in 1916 was beyond what reasonably might be expected. It was substantially the same as in 1910. The quantity contracted for was its entire production, using "due diligence to produce as much quicksilver as is possible." The language of the contract did not define the quantity specifically, and the actual production was the best evidence of the quantity agreed upon; it having been brought about in good faith and without fraud. Under the defendant's request any increase in production, however slight, due to the new mill or tramway, could not have been taken into account. This cannot be so. We think the request was properly denied and the charge as given proper.

In the 316th assignment the defendant complains that—

"There was no substantial evidence to sustain the amount of the verdict rendered, and the court erred in denying defendant's motion for the direction of a verdict."

This assignment contains two independent propositions. The first proposition evidently relates to the defendant's motion for a new trial, which was denied; but as no exception lies to that denial (Indianapolis, etc., R. R. Co. v. Horst, 93 U. S. 291, 301, 23 L. Ed. 898), nothing further need be said as to that branch, although we are of the opinion that there was substantial evidence to sustain the amount of the verdict. The last part of the assignment has previously been considered under assignment No. 269, which relates to the same thing.

This disposes of all the assignments specifically called to our attention. The remaining assignments relate to many of the matters which we have considered; but, as they have not been briefed or argued by the defendant, we regard them as waived.

As the court erred in refusing to permit the defendant to go to the jury on its illegal conspiracy defense, the verdict must be set aside and a new trial had.

The judgment of the District Court is reversed, the verdict is set aside, and the case is remanded to that court for a new trial, with costs to the plaintiffs in error in this court.

ANDERSON, Circuit Judge (concurring in part). I agree that the judgment must be reversed on the grounds stated in the majority opinion. There was abundant, perhaps conclusive, evidence that the plaintiff was a party to the conspiracy to corner the quicksilver market. I agree that a contract for buying quicksilver, if one had been made, would not be ultra vires the defendant's charter.

But I am unable to agree with the main conclusions of my associates as to the rest of the case. I think the evidence showed that the defendant's directors never authorized the delivery of the contract until Joseph H. Hoadley should report back to the defendant's directors that he had obtained the other contracts necessary to effect the corner and until the directors should then take further action; that this condition was brought home to the plaintiff through its agent Kalman Haas; that, as it was not even contended that this condition was fulfilled, there was no evidence for the jury of a completed contract.

I also think plaintiff's case was fatally defective, in that there was no competent evidence that the Corbin letter of February 18, 1916, was the corporate act of the defendant. Also that there were important errors in admitting evidence of telephone conversations with unknown persons alleged to be in the defendant's office, for the purpose of grounding an inference that A. H. Hoadley, chairman of the defendant's board of directors, knew of and authorized or ratified the Corbin letter, in spite of his direct testimony to the contrary.

But as it is unlikely, if the case comes up again, that the record will present the same problems, it would not seem useful now to elaborate the grounds of my dissent, with the necessary, copious, supporting, extracts from the testimony. I therefore content myself with this meagre indication of the nature and extent of my dissenting views.